**In re YACHTHAVEN RESTAURANT, INC., Debtor.**

**Bankruptcy No. 188–81616–260.**

United States Bankruptcy Court, E.D. New York.

July 20, 1989.

New York City Law Dept., Office of Corp. Counsel, New York City, for City of New York; by Eric A. Rundbaken, Leonard Goldberg, Rita Dumaine.

Paul I. Krohn, Brooklyn, N.Y., trustee for Yachthaven Restaurant, Inc.

Finkel, Goldstein, Berzow & Rosenbloom, for trustee of Yachthaven Restaurant; by Kevin Nash.

U.S. Trustee, Garden City, N.Y. by Alfred Dimino.

John Campo, LeBoeuf, Lamb, Leiby & MacRae, New York City, Trustee of W.F. Marina, Inc.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for trustee of W.F. Marina, Inc.; by Angela Sommers.

Robert A. Rattet, for petitioning creditors; by James Glucksman.

## DECISION

CONRAD B. DUBERSTEIN, Chief Judge.

This court has before it two motions with respect to the operation by the Yachthaven Restaurant, Inc., debtor herein, of a restaurant at the World's Fair Marina in Queens, New York. The debtor had operated such restaurant prior to the filing against it of an involuntary petition for relief under Chapter 11 of the Bankruptcy Code. Before the debtor's time to answer, move or otherwise plead to the petition had expired, the petitioning creditors applied to this Court for an order restraining the City of New York Department of Parks and Recreation ("the City") from taking any action to interfere with the debtor's use and occupancy of the restaurant property. The debtor's interest in, and its operation of the restaurant were the subject of an agreement entered into between it and another company, W.F. Marina, Inc. ("W.F.") which in turn had an agreement with the City relating to among other things, the restaurant. The application also sought the imposition of punitive damages against the City of New York for the alleged violation by it of the stay provided for by § 362 of the Bankruptcy Code. The motion was returnable on October 20, 1988 and was thereafter adjourned to November 9, 1988 by consent of the parties. Prior thereto, on motion of the United States Trustee, the Chapter 11 case was converted to a Chapter 7 case and the United States Trustee appointed Paul I. Krohn, Esq. as Interim Trustee.

At the hearing on the motion for a restraining order, the trustee orally indicated his desire to assume the agreement by which the debtor occupied the subject premises and the restaurant. It was his contention that the agreement gave rise to an executory contract which he sought to assume in accordance with the provisions of § 365. His oral application was contested and disputed by representatives of the City. This Court gave both parties an opportunity to exchange memoranda of law and the Court reserved decision. That portion of the relief requested by the Order to Show Cause which sought to restrain the City from interfering with the debtor's use and occupation and to impose sanctions against it was deemed withdrawn, in light of the conversion of the case from Chapter 11 to Chapter 7 and the fact that the debtor was no longer operating in the premises.

Thereafter, the trustee retained counsel which brought on a written motion for an

order authorizing the trustee to assume and assign the aforementioned agreement and further sought authorization to sell all of the debtor's assets to an offeror. In essence, the motion adopted the trustee's oral application to assume the agreement which he had made during the aforesaid hearing before this Court on November 9, 1988. The motion came on to be heard on May 10, 1989 before Honorable Edward J. Ryan, United States Bankruptcy Judge, who had been assigned to conduct hearings in my Court during the time I was absent by reason of illness. At the same time, the City made a cross-motion seeking a declaration that the agreement relating to the premises should be deemed to be a license agreement, that the same had been terminated prior to the institution of the bankruptcy case and therefore cannot be assumed or assigned by the trustee. Upon my return, I reviewed all of the facts relating to this issue, and the following is my opinion by which I hold that the trustee has no interest in the premises, his motion is denied and the cross-motion of the City is granted.

### FACTS

The debtor operated a dining establishment at the World's Fair Marina, Flushing Meadow/Corona Park, Queens, New York under the name "LaShea Restaurant" pursuant to a sub-license agreement executed by W.F. Marina, Inc. ("W.F."), as sublicensor, and the Debtor as sub-licensee. W.F. Marina is a licensee of the City.

In 1983 the City advertised for bids from prospective concessionaires to renovate and operate a marina and restaurant at the World's Fair Marina. The Debtor was not a bidder for the concession. W.F. submitted the successful bid. The marina at the time was in a state of extreme disrepair and as a result the City required that the successful bidder contribute its own capital for the necessary improvements and repairs. The City therefore entered into a license agreement with W.F. on July 27, 1983, whereby a license was granted to operate, maintain and make improvements to the marina area for recreational boating, including the operation of a "first class"

restaurant facility. In exchange, W.F. was obligated to pay the City a minimum of $7,500 a month or 15% of gross revenues plus 60% of any sub-license fee, whichever is greater.

On December 6, 1984 W.F. entered into a sub-license agreement with the debtor to operate, maintain and make improvements to the restaurant facility at the marina. The City was neither a party to nor a signatory of the sub-license agreement. The sub-license agreement stated that "the sub-license is subject to and subordinate to the license granted to W.F. Marina." In addition, all fees due from the Debtor pursuant to the sub-license were to be paid to W.F. and not the City.

As required by the licensing agreement W.F. and the Debtor made substantial renovations and repairs. There is a dispute as to the exact amount expended by the parties but it was approximately $1,000,000.

Between July 1984 and January 1988 the City transmitted approximately 18 notices to W.F. concerning garbage and debris strewn about the parking areas, failure to pay the rental or license minimum fees and failure to provide the City with financial statements so as to allow calculation of the rent or license fees as required.

On November 19, 1987 the City sent a Notice of Termination to W.F. revoking W.F.'s license. The City stated in the Notice of Termination that W.F. had established a pattern of noncompliance with its contractual obligations. The City subsequently gave W.F. an extension of time to surrender the premises until January 13, 1988. It considered giving W.F. additional time to comply under the following terms: agreement to the severing of the LaShea Restaurant from the licensed premises and its readvertisement as a separate concession operation; the payment of additional license fees due as a result of the understatement of revenues and the overstatement of expenses; and the expending of additional capital expenditures. Jesse Cromer, principal of W.F. agreed to these terms and signed the first extension agreement. A second extension proposed by the

City was never accepted by W.F. and therefore never became effective.

W.F. and the Debtor subsequently refused to provide financial records to the City so that rental fees could be determined. By this time, the City made known to W.F. that the license agreement between them had been terminated by reason of W.F.'s failure to perform the terms of the agreement. It also informed W.F. of its intention to advertise and accept new bids for the restaurant from potential concessionaires. The City was in contact only with W.F., the party they had contracted with. W.F. then instituted a lawsuit in the Supreme Court of the State of New York, County of Queens, against the City alleging that its license was terminated in an arbitrary and capricious manner. It moved for a preliminary injunction to enjoin the City from evicting W.F. The request for injunctive relief in the state court was denied.

The litigation between the City and W.F. was stayed by W.F.'s filing in this Court of a petition for relief under Chapter 11 of the Bankruptcy Code on April 11, 1988. The case was subsequently converted to one under Chapter 7 and a trustee was appointed.

On June 14, 1988 Yachthaven, the within debtor, filed a petition for relief under Chapter 11 in this Court. Both cases are pending before the undersigned Bankruptcy Judge.

The Debtor approached the City requesting permission to remain in possession and continue operation. It should be noted that W.F. has not been in possession of the Marina premises since early 1988. The City informed the Debtor that the sub-licenses between it and W.F. had terminated by operation of law when the license between W.F. and the City was terminated. The City, however, conceded that it would consider granting a temporary permit to allow the debtor to continue to operate the restaurant pending readvertisement for new bids as a separate concession. The City gave the Debtor personal and business questionnaires to complete which were never returned to the City and the Debtor refused to cooperate with an investigation by the Inspector General of Parks into its income and assets. The Debtor also refused to turnover financial records to the City, claiming that Jesse Cromer, a shareholder of both the Debtor and W.F. had all the necessary records.

The Debtor did mail two checks to the City, both of which were returned uncashed. In fact, no money was ever accepted by the City from the Debtor. On April 15, 1988, the City served a Notice to Quit upon the debtor. This notice was sent prior to the commencement of summary eviction proceedings, a requirement pursuant to New York Real Property Actions and Proceedings Law. The state court issued a temporary restraining order preventing the City from taking any action to evict the Debtor. Subsequent proceedings were stayed when the Debtor filed under Chapter 7 of the Bankruptcy Code in June of 1988.

## DISCUSSION

The debtor's principal argument is that the license and sublicense agreements are executory contracts and therefore the licensee is afforded the same rights to assume and assign the license agreement as if it were a lease pursuant to § 365 of the Bankruptcy Code. This argument is flawed by the very definition of a license. With respect to real property, a license has been defined as an authority to enter upon the lands of another to do a particular act or series of acts without possessing any interest in the lands. 3 Warren's Weed on the New York Law of Real Property, *License* § 102 (1989). Furthermore, it is personal to the licensee, is not assignable by him and is revocable by the licensor. 49 N.Y.Jur.2d *Licenses in Real Property* § 195 (1985). It creates no burden running with the land. It is the lowest order or privilege touching or affecting real property. *Lombardi v. Lombardi*, 63 A.D.2d 1111, 406 N.Y.S.2d 396 (3d Dept. 1978). It flows with the person to whom it attaches, indivisible and inseparable from him and able to be immediately withdrawn or extinguished at the will of the licensor.

*Schnipper v. Flowood Realty Corp.*, 113 N.Y.S.2d 842 (1952 New York Mun.Ct.), *rev'd on other grounds*, 122 N.Y.S.2d 178 (App.Term).

■■■ The main distinction between a license and a lease is that "a license to do an act on land involves occupation of the land by the licensee so far as is necessary to do the act and no further, whereas a lease gives the right of possession of the land and the exclusive occupation of it for all purposes not prohibited by its terms." 49 N.Y.Jur.2d *Licenses in Real Property* § 199 (1985). *Id.* Unlike a license, a lease creates a present estate in the land for the benefit of the lessee.

■■■ Whether a particular instrument is a license or a lease depends upon the manifest intent of the parties as gleaned from the entire contents of the instrument. *Greenbro Coin Meter Corp. v. Basch*, 205 Misc. 853, 132 N.Y.S.2d 876 (Sup.Ct.1954). A provision in an instrument that is to be regarded as a license and not a lease, while not absolutely controlling, is of considerable importance in determining whether the instrument should be treated as such. *Goldsmith v. Outdoor Advertising Co.*, 147 Misc. 536, 264 N.Y.S. 189 (Sup.Ct.1933), *aff'd*, 240 A.D. 943, 268 N.Y.S. 889 (4th Dept.1933). In *Goldsmith*, the lessor was precluded from treating the agreement as a lease due to a provision in the writing itself setting forth that the agreement should not be deemed a lease, but merely an "exclusive right and privilege." Similarly, in the case at bar, the agreement between the City and W.F. can only point to the granting of a license. Throughout the underlying document W.F. is referred to as the licensee. Additionally, Article II of the license agreement is entitled "NO LEASE", and states: "It is expressly understood and agreed that no land is leased to licensee." Finally, the City is precluded by law from alienating park land in the absence of a grant from the state legislature. *Miller v. City of New York*, 15 N.Y.2d 34, 203 N.E.2d 478, 255 N.Y.S.2d 78 (1964). Therefore, the City could not legally have intended to enter into anything other than a license agreement. The intent of the par-

ties could not have been manifested more clearly by the actual written agreement and therefore the law with respect to licenses will apply to the issues in this proceeding.

■■■ The common law rule is that a license in real property is revocable at the will of the licensor unless it is coupled with an interest or made irrevocable by the terms of the contract. 49 N.Y.Jur.2d *Licenses in Real Estate* § 211 (1985). In *Cannon v. Towner*, 188 Misc. 955, 70 N.Y.S.2d 303 (Sup.Ct.1947), the Court noted that, "[I]t is elementary that a naked license is revocable at the will of the licensor." There, a license had been granted for the use of a school auditorium in exchange for valuable consideration. In reliance thereon the licensee sold tickets, advertised and made other arrangements that resulted in a license coupled with an interest arising out of a contract supported by consideration. Such a license was not held to be revocable at will. *Id.* 70 N.Y.S.2d at 311. Therefore, where a license is given pursuant to a contract for a definitive term, on valuable consideration, a revocation of the license before expiration of the agreed term ordinarily constitutes a breach of contract and gives rise to a personal action. *Nemmer Furniture Co. v. Select Furniture Co.*, 25 Misc.2d 895, 208 N.Y.S.2d 51 (Sup.Ct.1960).

■■■ The parties to a license, however, may freely agree that the license be revocable at any time after notice has been given. In the case at bar, both the prime license between the City and W.F. and the sub-license between W.F. and the Debtor provided for termination at will by the Commissioner of Parks. Clause Two of the prime license agreement entitled "TERM", states, "The term of this license shall be effective as of April 1, 1983 and is revocable at will by the Commissioner upon ten days written notice to that effect. In the event such notice is not given, the term shall continue for a period of ten years ..." Clearly, while this is not a naked license because it does speak of a term and therefore may not be terminable at will, it does include a term negotiated by the par-

ties and consequently would be terminable by the City upon ten days notice. In *Miller, supra* 15 N.Y.2d at 38, 203 N.E.2d 478, 255 N.Y.S.2d 78, the court stated that since the property was a park impressed with a trust for the public, it could not without legislative sanction be alienated or subject to anything beyond a revocable permit. Therefore, the Commissioner was authorized to use his right to cancel the license providing he was acting in good faith. Similarly, in the case at bar, it is clear the City had ample grounds for termination. There is no dispute as to the substantial defects which existed on the premises at the time of the Notice of Termination.

■ Article XXXV of the license contains procedures for termination for violation of its terms. The Trustee for Yachthaven in his brief misquotes the language of this Article in order to view it as a condition subsequent rather than a conditional limitation. The difference, as the Trustee notes, is very important. With a breach of a condition subsequent termination can only take place through an action in ejectment, while breach of a conditional limitation automatically terminates the agreement.[1] If the provision is construed as a conditional limitation then the license was terminated prior to the filing of the bankruptcy petition. A conditional limitation is a term of art which can only be created by precise language and the words actually used by the parties are given paramount importance and override their intent. *Burnee Corp. v. Uneeda Pure Orange Drink Co.*, 132 Misc. 435, 230 N.Y.S. 239 (App. Term 1st Dept.1928). Justice Levy, in *Burnee Corp., supra,* set forth three types of conditional limitations: 1) Where the event agreed upon is to limit the estate without further act of either party (an example would be a limitation such as estate to X so long as he remains married); 2) where the happening of the future contingency is set in motion by the landlord (an example of this is a clause which furnishes the landlord the right to terminate the lease on a given number of days notice or in the event of sale of the property); and 3) where there is a breach of a condition on the part of the tenant of a provision inserted in the lease for the benefit of the landlord, the violation of which entitles the landlord to serve a notice electing to terminate the lease after a specified period of time. The case at bar is of the third type. In *In re Family Showtime Theaters, Inc.*, 72 B.R. 38 (Bkrtcy.E.D.N.Y.1987), *aff'd*, 819 F.2d 1130 (2d Cir.1987), the District Court held that under New York law, a lease clause providing that the lease would expire if tenants failed to install elevators created a conditional limitation rather than a condition subsequent. Thus, the lease terminated by its own terms and the tenant had no interest to assume or reject where it failed to install the elevators before it filed for Chapter 11. In holding that the lease was terminated prior to the filing of the Chapter 11, Judge Bramwell noted the New York Court of Appeals decision in *First National Stores, Inc. v. Yellowstone Shopping Center, Inc.*, 21 N.Y.2d 630, 237 N.E.2d 868, 290 N.Y.S.2d 721 (1968) ("Yellowstone") which involved facts closely analogous to *Family Showtime.* Both in *Family Showtime* and *Yellowstone* the leases provided that in case of default in violation of any covenant, after receipt by the lessee of notice by the lessor then, at the option of the lessor, the lease term may be declared ended. *Family Showtime*, 72 B.R. at 42. In *Yellowstone,* both the Appellate Division and the Court of Appeals held that the landlord "properly invoked the applicable provisions for terminating the lease." *Id.* (quoting *Yellowstone*, 21 N.Y.2d at 637, 237 N.E.2d 868, 290 N.Y.S.2d 721). It is interesting to note that Judge Bramwell declined to follow the decisions cited by the trustee in support of his position in this case, as for example, *In re Adirondack Ry. Corp.*, 28 B.R. 251 (Bkrtcy.N.D.N.Y.1983); *In re Delta Motor Hotel of Syracuse, Inc.*, 10 B.R. 585 (Bkrtcy.N.D.N.Y.1981); *Norman S. Ries-*

---

**1.** See 2 Rasch's New York Landlord and Tenant § 752 (2d ed.1971) for a complete discussion of conditional limitations.

*enfeld, Inc. v. R.W. Realty Co.*, 223 A.D. 140, 228 N.Y.S. 145 (1st Dept.1928).

Article XXXV of the license agreement states that if the licensee fails to comply with any of the provisions of the agreement, the City may order the breach to be remedied and if the licensee fails to do so then the license shall immediately terminate. In addition, it provides that if a second or repeated violation of the same provision takes place, the Commissioner may by notice revoke the license, such revocation to be effective immediately upon mailing. Thus, the license agreement in the present case is similar to *Family Showtime* and *First National Stores*. It contains a conditional limitation and therefore the repeated violation by W.F. of the covenants of the agreement effected its termination upon mailing of notice.

The Trustee further contends that the City accepted an established pattern of non-compliance of minor problems and that the City terminated the license in an arbitrary and capricious manner. That conclusion is not borne out by the evidence. It is clear that W.F. needed continuous prodding by the City in order to force compliance with the agreement and that such compliance was not forthcoming. In fact some terms, such as the requirement that the City be provided with financial data so that the monthly license fees may be calculated, go right to the heart of the agreement. Failure to observe that request even standing alone was reason enough for the City to cancel its relationship with W.F.

A case recently decided by the Supreme Court, State of New York, New York County, rests virtually on all fours with the instant action and warrants consideration. There the defendant entered into a licensing agreement with the City to operate a restaurant. It further provided that the defendant expend substantial sums in order to renovate the property, provide financial information to the City for determination of fees, and included a clause stating the license is terminable at will by the Commissioner. In fact, it appears to be virtually the same type of standard licensing agreement entered into between the

City and W.F. The defendant repeatedly violated the agreement including violation of the Health Code. Despite the fact that the concessionaire expended approximately $750,000 the court ruled the license was terminated. See *Yum Yum Flushing Meadows Restaurant, Inc. v. Stern*, N.Y. L.J., Sept. 7, 1988 pg. 18, col. 2 (Sup.Ct.N. Y.Co., Kirschenbaum, J.).

Yachthaven's additional argument that it is not bound by the termination of W.F.'s license is also unfounded. In the case of a lease, a subtenant's rights are measured by those of its immediate landlord, the sublessor, and by its own terms the cancellation of the lease as to one cancels it as to both. *World of Food, Inc. v. New York World's Fair*, 22 A.D.2d 278, 254 N.Y.S.2d 658 (1st Dept.1964). Accordingly, if a sublease comes to an end because of the violation of the paramount lease by its own terms, the sublease which was carved out of it falls with it. The same result follows that where a licensee defaults, the sublicense falls. Thus, when the license between the City and W.F. was terminated, the sublicense between W.F. and the debtor was likewise terminated.

Finally, the Trustee contends that the recent case of *In re Moreggia & Sons, Inc.*, 852 F.2d 1179 (9th Cir.1988) is supportive of his position. That case is noticeably distinguishable from the one before this Court. In *Moreggia*, the debtor had a possessory interest in "stalls" at a produce terminal. The Market Corporation, developer of the produce terminal, was incorporated solely to assist the City of San Francisco relocate businesses displaced as a result of a City redevelopment project. To perform its task, the Market Corporation issued bonds to finance the construction of the produce terminal. It then granted a 50 year "use rights" in the stalls to the displaced businesses. The basic monthly rent was $275, calculated solely to provide the funds necessary to retire the bonds. The obligation to pay rent ceased upon retirement of the bonds. The agreement also required the debtor to make other payments for utilities, parking and insurance, but these obligations were *de minimus*

relative to the possessory interest in the stalls.

At the time of the filing of the petition, the obligation to pay the rent had ceased. The Court held that the agreement no longer carried executory burdens and the debtor therefore had an exclusive right of possession for a substantial term of years. Additionally, the Court noted that the debtor's failure to meet any of the remaining obligations under the lease would not entitle the Market Corporation to reclaim the property.

The Court held that the agreement created a property interest, that the debtor had a prepaid right of possession, with no material future obligations. The agreement no longer carried executory burdens to assume or reject. Therefore, a forfeiture of the property interest, after full performance and payment, merely for failure to assume would be grossly inequitable.

In the case at bar, the factual situation is very different. W.F. had not fully performed the material obligations of the agreement. It was required to continue to pay a significant rental fee, based on gross receipts. Additionally, W.F. had failed to fully perform post-obligations arising under the agreement, forcing the City to send repeated notices to cure. Finally, in *Moreggia*, the Court held that the debtor had a property interest, and the Market Corporation could not reclaim the property. W.F. never had a property interest, but merely a license, restricted solely to W.F., that allowed for the City to terminate it if the obligations of the agreement were not met. We see very little parallel between the two cases. Here there was nothing to assume or reject. Any interest which W.F. may have had in the license terminated prior to the filing of the petition and was therefore extinguished.

## WAIVER AND ESTOPPEL

The Trustee in his brief asserts that regardless of the issue of whether or not the license was terminated, the doctrines of waiver and estoppel should preclude the City from being allowed to terminate the agreement. This argument is without merit and should be summarily disposed of.

The Trustee contends that the City approved and consented to the execution of a separate sublicense agreement. Moreover, he contends that by considering the possibility of the severance of the restaurant from the Marina, the City treated the restaurant as a separate entity apart from the W.F. license agreement. While it is true that the City did know of the debtor's presence under a separate license agreement, the City at no time dealt with the debtor. The City's sole agreement was with W.F. The City knew that any agreement that the Debtor had with W.F. was wholly subordinate to the primary licensing agreement, and as such forfeited no rights with respect to it.

The Trustee cites a few items as evidence of the relationship between the City and the debtor. The first has to do with the presentation of rent checks. Presentation of checks is not acceptance. The Trustee asserts that by mailing checks to the City, the City accepted the debtor as a separate entity covered by a separate agreement. While the City admits to receiving two checks, both were returned uncashed. The only entity the City was to receive monies from was W.F. and prior to that time the debtor had solely paid its rent to W.F. The Trustee cites two cases, *In re Delta Motor Hotel of Syracuse, Inc.*, 10 B.R. 585 (Bkrtcy.N.D.N.Y.1981) and *In re T.H.W. Enterprises*, 89 B.R. 351 (Bkrtcy.S.D.N.Y.1988) in support of his position, but in both those cases the landlord accepted and cashed rent for periods of over one year from the tenant after termination of the lease. It is also of importance to note that whenever the City had reason to send notices to cure regarding violations of the license agreement, they were sent to W.F. regardless of whether W.F. or the debtor were responsible for the violation. The City dealt solely with the entity it had contracted with. The fact that the City issued a separate notice of termination is without merit. The City was required by New York Real Property and Proceedings Law to send an eviction notice prior to the

commencement of eviction proceedings. The primary license was still terminated in accordance with the agreement.

The Trustee also argues that the City intended to sever the restaurant premises from the Marina with the intention of allowing it to continue to operate. This argument seems highly dubious. Given the problems with W.F., it does not seem logical that the City would allow the debtor to remain when Mr. Cromer was the sole shareholder of W.F. and a major shareholder in the debtor/restaurant. Moreover, the City is bound by city law to submit such licensing agreements to a formal bidding process and it is doubtful that the City intended to violate city law. The debtor could only be awarded a license if it were the successful bidder. Finally, the City did request documentation but only to allow for a temporary operating permit, and as mentioned, the City was prohibited by law from giving anything more. The requested· information was never turned over to the City and the debtor evidenced nothing but bad faith in failing to cooperate with the City.

The Trustee of Yachthaven further states that estoppel arises against the City from the fact it permitted improvements to be made to the premises and gave assurances to the debtor that the restaurant sublicense would survive the termination of W.F.'s license. There is no evidence in the record to support a finding that the City ever gave such assurances.

■ The doctrine of equitable estoppel should be applied with great caution when dealing with realty. *Huggins v. Castle Estates, Inc.,* 36 N.Y.2d 427, 330 N.E.2d 48, 369 N.Y.S.2d 80 (1975). In *In re Delta Motor Hotel, supra,* citing *United States v. Bedford Associates,* 491 F.Supp. 851, 866–67 (S.D.N.Y.1980), *cert. denied,* 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982), the elements of equitable estoppel under New York law are stated as: 1) conduct which amounts to false representations or concealment of material facts or which gives the impression that the facts are otherwise than asserted, 2) intention or expectation that such conduct would be relied upon by the other party, and 3) actual·or constructive knowledge of the real facts. The elements relating to the party asserting estoppel defense are: 1) lack of knowledge of the real facts, 2) reliance on the conduct of the party to be estopped, and 3) action based thereon resulting in a prejudicial change of position. To these elements a qualification must be added. For the court to invoke estoppel principle against a landlord, it must be shown that the claimed injured party acted in good faith.

The record bears the following facts concerning the party to be estopped. The conduct of the City was to insist upon strict compliance with the agreement. To enforce such compliance the City sent numerous notices to cure to W.F. Violations of the agreement were perpetuated by both W.F. and the debtor. The debtor had full knowledge of W.F.'s problems with the City, and it was aware that their sub-license was in jeopardy. At that time the debtor could have commenced an action in state court to force W.F. to comply with the agreement. Again, it is important to reiterate the fact that W.F. and the debtor had a common shareholder, Mr. Cromer. There could be no possibility that the debtor did not know of the terms of the primary license. The City at no time concealed or attempted to conceal any of the facts to the Debtor.

■ In *Yum Yum Flushing Meadows Restaurant, Inc., supra,* the defendants argued that the City's acts to terminate the license was tantamount to a forfeiture of $750,000 invested in improvements. Similarly, the debtor herein argues that the City permitted substantial improvements to be made and that it would be inequitable to allow the license to be terminated. The consideration paid by W.F. for the license included a monthly rent as well as the obligation to make expenditures for improvements. This was an integral part of the consideration. Unlike *Yum Yum,* where the facility never even opened, here both the Marina and the restaurant operated for a period of years. Yet, in *Yum Yum* the court found no problem with the

termination of the license. There should be no problem here as well. W.F. and the debtor knew the terms of the license and sub-license agreements and they knew full well if they did not live up to the covenants therein, their interests would terminate and would force the forfeiture of any expenditures made. The court notes that the Trustee for W.F. has not instituted an action similar to the one presently pending before this court. The only motion was made by the trustee of Yachthaven even though W.F. expended substantially more in renovations than the debtor herein.

As stated, in order for estoppel to be allowed, a party must have acted in good faith. The debtor and W.F. repeatedly violated the terms of the agreement in the face of constant compliance by the City. They failed to provide financial information, failed to provide personal and business information and failed to cooperate with the City in attempting to obtain and provide correct revenue figures. Therefore, the debtor should not be allowed to invoke the principle.

▇▇▇▇ "... governmental units cannot be estopped when acting in a governmental capacity." 57 N.Y.Jur.2d *Estoppel, Ratification and Waiver* § 68 (1986). But a governmental body or agency may be estopped the same as an individual where it is acting in a contractual or proprietary capacity. *Id.* at 97. Thus, where a governmental subdivision acts or comports itself wrongfully or negligently, inducing reliance by a party who is entitled to rely and who changes his position to his detriment or prejudice, that subdivision should be estopped from asserting a right or defense which it otherwise could have raised. *Id.* at 97. In the case at bar, the City was not acting in a contractual capacity with respect to the debtor. The City solely contracted and dealt with W.F. Additionally, the City did not act wrongfully or negligently. In fact, it acted in strict compliance with the agreement. Moreover, we agree with the City that it is the law of New York that estoppel may not be invoked against a municipality to enforce an agreement which violates express statutory provisions. *Granada Buildings, Inc. v. City of Kingston*, 58 N.Y.2d 705, 444 N.E.2d 1325, 458 N.Y.S.2d 906 (1982). No direct relationship existed between the debtor and the City. Here estoppel should not be used to impose upon the City a contract that does not meet all the statutory requirements. Such restrictions are for the benefit of the public. The City must allow for a bidding and approval process as required by the New York City Charter. It must know who it is allowing to use park land, which it manages in trust for the benefit of the public. It is important to reiterate that the debtor failed to provide even the minimum amount of information required to allow the issuance of a temporary operating permit. To allow recovery which contravenes such restrictions would give vitality to illegal acts. As a matter of law the City could not itself waive or disregard requirements which have been properly determined to be in the interests of the whole. *Genesco Entertainment, A Division of Lymutt v. Koch*, 593 F.Supp. 743 (S.D.N.Y.1984). In *Genesco*, the plaintiff sought damages for the alleged breach of an oral agreement to lease Shea stadium for a concert. Recovery was denied where the court found that the making of the subject contract flaunted a firm public policy or violated a fundamental statutory restriction upon the powers of the municipality or its officers. *Id.* at 749.

11 U.S.C. § 365(c)(1) states that the Trustee may not assume an executory contract if applicable non-bankruptcy law prohibits it. The courts have held § 365 does not deal exclusively with the problem of personnel service contracts but includes situations where state or federal law can be said to bar assignment. *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27 (1st Cir.1984); *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983).

Section 3 of the New York City Charter allows the Mayor to issue executive orders which have the force of law. The Mayor issued an order that states: "Rights under a concession agreement, shall not be sold, assigned or otherwise transferred without approval by the Concession Review Committee." The City is responsible for

screening for the benefit of the public all potential concessionaires to make sure they are honest and professional. Therefore, we are satisfied that the requirements of § 365(c) are met and the license is not assignable.

Submit Order consistent with this Decision.