**In re M.J. & K. CO., INC., Debtor.**

**Bankruptcy No. 93 B 44648 (JLG).**

United States Bankruptcy Court,
S.D. New York.

Dec. 10, 1993.

Brown Raysman & Millstein, New York City, for Brooklyn Law School.

Robert L. Greene, New York City, for debtor.

*MEMORANDUM DECISION ON MOTION FOR AN ORDER FOR RELIEF FROM THE AUTOMATIC STAY*

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Brooklyn Law School ("BLS") has moved by Order To Show Cause pursuant to § 362(d)(1) of the Bankruptcy Code ("Code") for relief from the automatic stay to permit it to (i) serve a notice to quit (the "Proposed Notice") pursuant to Article 7 of the New York Real Property Actions and Proceedings Law ("RPAPL") on M.J. & K. Co., Inc. (the "Debtor"), with respect to certain space located at BLS (the "Premises") and (ii) take any other action pursuant to applicable law necessary to cause Debtor to vacate the Premises. The Debtor opposes the motion. For the reasons set forth below, the motion is granted.[1]

*Facts*

The facts, as established during the evidentiary hearing conducted in this matter, are as follows. On September 15, 1993, Debtor filed a voluntary petition under Chapter 11 of the Code. Since that time, Debtor has remained in possession and control of its assets and business as debtor in possession pursuant to §§ 1107 and 1108 of the Code.

On or about December 16, 1982, BLS and the Debtor entered into an agreement (the "Agreement")[2] granting Debtor the exclusive "right, permission, license, and privilege to operate a Law School bookstore for the sale of stationary, casebooks, hornbooks, review books, and bookstore related products, and for no other purpose" at BLS. *See* Agreement, p. 1. The Agreement provides that it is to be in full force and effect as of December 16, 1982 "for a period of one year with a three year contract to follow if Brooklyn Law School is satisfied with the service." Agreement, p. 1. On or about December 16,

---

[1]. This memorandum decision constitutes our findings of facts and conclusions of law pursuant to Fed.R.Civ.P. 52, as made applicable to this contested matter by Bankruptcy Rules 7052 and 9014. Our subject matter jurisdiction of this matter is predicated on 28 U.S.C. §§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(G).

[2]. The parties to the Agreement actually are BLS and M.J. and K. Company, the Debtor's predecessor.

1982, Debtor began its bookstore operation in space located in the basement of the school building at 250 Joralemon Street, Brooklyn, New York. Debtor has operated the bookstore at BLS without interruption since that date, except that in August 1990, at BLS' direction, the store was moved to its present location in the school's building at 184 Joralemon Street. BLS and the Debtor agree that since the expiration of the one year term stated in the Agreement, the parties have made no verbal or written arrangement to extend, renew or otherwise modify the Agreement, or any of its terms or conditions.

The Debtor operates retail bookstores under what it describes as separate license agreements at BLS, The Benjamin N. Cardozo School of Law, Yeshiva University, New York, New York ("Cardozo Law School") and Touro College Jacob B. Fuschberg Law Center, Touro Law School, Huntington, New York ("Touro Law School"). The merchandise sold by Debtor at the BLS bookstore includes text books and related materials ordered specifically for courses offered at BLS. Given the nature of Debtor's operations, its busiest times of the year are at the beginning and end of each academic semester. The beginning of each academic semester is when Debtor sells the bulk of its text book inventory. At the end of each semester Debtor purchases the text books and related materials it will offer for sale in the following semester. As such, Debtor's book orders are keyed to the BLS curriculum for the next succeeding semester. Although Debtor may be able to estimate its requirements for particular courses which have been previously offered at the law school, it cannot be certain of its inventory needs until BLS supplies it with a list of course offerings, enrollment figures and the required text for each course being offered. As a matter of policy, BLS prohibits faculty members from submitting book orders to the Debtor until the schedule of classes for the next semester is distributed. The schedule for the Spring semester is usually not fixed or published until late in the Fall semester. Estimating text book requirements is particularly problematic for newly offered courses because of the uncertainty over how heavily those courses will be subscribed. Likewise, when previously offered courses are taught by a new professor, or when a new text is published for a particular course, the Debtor cannot be certain of which books to order until it is advised which text will be utilized in the particular course. Debtor's ability to secure book orders is critical to the efficient operation of the law school. If text books are not available at the outset of the semester, teaching plans may be compromised and students will be prejudiced in their efforts to prepare for and participate in class. Because of the uniformity in book assignments among New York metropolitan area law schools, a shortage of books at BLS likely will mean that BLS students will not be able to obtain required texts elsewhere.

On or about September 29, 1993, David G. Trager, as Dean of BLS, received a memorandum from Professor Spencer Weber Waller complaining about Debtor's delay in obtaining the text book for the International Trade Law course he was teaching during the Fall 1993 semester. Dean Trager's undisputed testimony was that Professor Waller's complaint was merely the last in a long series of written and verbal protests from faculty members over Debtor's operation of the bookstore. Shortly thereafter, Dean Trager determined that the school should consider terminating its association with the Debtor and directed appropriate BLS personnel to solicit bids from vendors interested in operating the bookstore. The rationale for Dean Trager's decision was two-fold. First, he reasoned that awarding the bookstore contract to a new vendor would promote efficiency at the law school because the faculty and administration could focus their energies on educating students and not be bothered by issues involving the operation of the bookstore. Second, the action would advance BLS' policy of awarding short term contracts to service vendors. Under Dean Trager's stewardship the law school has refrained from entering into long term service contracts in favor of short term arrangements awarded after competitive bidding. For example, BLS has short term contracts with its custodial service, as well as the food service that operates the BLS cafeteria. That policy ensures that BLS will receive

quality performance at competitive prices. Notwithstanding Debtor's long association with the school, Dean Trager did not believe BLS was bound to retain Debtor service and wanted to explore the school's alternatives.

The Debtor did not formally notify the law school's administration of the filing of its Chapter 11 petition. Dean Trager heard of the event from a faculty member after he received the Waller memorandum. Thereafter he learned that West Publishing Inc., Little Brown Co. and The Foundation Press, Inc. have refused to ship books and related materials to the Debtor, for ultimate sale to BLS students and faculty, for the Spring 1994 semester, without payment of cash on delivery. He also learned that Debtor is engaged in litigation with Matthew Bender Co., another publisher that supplies law books and related materials to the school. With that information, the Dean became concerned that Debtor would be unable to supply the text books and related materials needed for courses to be taught in the Spring 1994 semester. Accordingly, he determined that the Debtor's operations at the law school should be terminated.

That decision apparently was communicated to Debtor's principal, Mr. Gil Hollander. By letter dated November 5, 1993, Debtor's counsel advised Dean Trager, among other things, that the law school could not interfere with Debtor's operation of its business without first obtaining relief from this Court. That letter also stated that:

> [BLS] and [Debtor] have had mutual contractual obligations to extending over 11 years, and which are not up for renewal or termination until December of 1995. The agreement is an executory agreement which [Debtor], as a debtor in possession has a statutory right to reaffirm or reject. We had intended to reaffirm that agreement and we hereby do so.[3]

This letter was the first communication to the law school in which Debtor took the position that it was operating the bookstore pursuant to a long term contract.[4]

### Discussion

■ The automatic stay of § 362(a) of the Code is intended to "protect the debtor from its creditors and to provide for the orderly administration of the debtor's estate." *See In re Ionosphere Clubs, Inc.,* 105 B.R. 765, 771 (Bankr.S.D.N.Y.1989), *rev'd in part on other grounds,* 922 F.2d 984 (2d Cir.1990); *see also In re Planned Systems, Inc.,* 78 B.R. 852, 857 (Bankr.S.D.Ohio 1987).

■ Pursuant to § 362(d)(1), a party in interest is entitled to relief from the automatic stay if it can show "cause", which is defined to include "the lack of adequate protections of an interest in property of such party in interest." *See* 11 U.S.C. § 362(d)(1). When deciding whether to modify the automatic stay, "the court must consider the particular circumstances of the case and ascertain what is just to the claimants, the debtor, and the estate." *In re Mego Int'l Inc.,* 28 B.R. 324, 326 (Bankr.S.D.N.Y.1983).

■ As movant, BLS has the initial burden of showing a legally sufficient basis, or cause, for lifting the automatic stay. *See Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.),* 907 F.2d 1280, 1285 (2d Cir.1990); *In re Leibowitz,* 147 B.R. 341, 343 (Bankr.S.D.N.Y.1992); *In re Drexel Burnham Lambert Group Inc.,* 113 B.R. 830, 837–38 (Bankr.S.D.N.Y.1990). Once cause is shown to exist, the debtor must prove that it is entitled to the protections afforded by the stay. *In re Sonnax Indus., Inc.,* 907 F.2d at 1285; *In re Domestic Fuel Corp.,* 70 B.R. 455, 463 (Bankr.S.D.N.Y.1987).

■ Although neither the statute nor its legislative history defines "cause" sufficient to sustain a § 362(d)(1) motion, it is viewed as a broad and flexible concept. *See, e.g., Sumitomo Trust & Banking Co. v. Holly's Inc. (In re Holly's Inc.),* 140 B.R. 643, 687

---

3. Notwithstanding the position advocated in the letter, Debtor has not claimed in this litigation that the Agreement has been assumed. Further, we note that Debtor has not requested Court authorization to assume the Agreement, as required by § 365(a) of the Code.

4. The Debtor has not listed either the Agreement, or the alleged agreements with Cardozo Law School and Touro Law School, among the executory contracts identified in Schedule G (Statement of Executory Contracts and Unexpired Leases) of its Chapter 11 petition.

(Bankr.W.D.Mich.1992). Accordingly, the determination of whether sufficient cause exists to grant stay relief must be addressed on a case by case basis. *See e.g., Christensen v. Tucson Estates, Inc. (In re Tucson Estates Inc.),* 912 F.2d 1162, 1166 (9th Cir.1990); *In re Holly's, Inc.,* 140 B.R. at 687; *Peterson v. Cundy (In re Petersen),* 116 B.R. 247, 250 (D.Colo.1990).

The parties concur that the Agreement gives rise to a license. They differ over the nature of the license, its length and whether cause exists under § 362(d)(1) to grant BLS the relief it now seeks. BLS contends that the stay should be modified to permit it to serve the Proposed Notice and remove Debtor from the Premises because the Agreement creates a license in real property which expired on December 15, 1983. The Debtor claims that it has a license to conduct business at BLS that will not expire until December 15, 1995 and that BLS has failed to establish cause for granting it the relief sought herein.

■ A license in real property is a contract which permits a party "to render services within an enterprise conducted on premises owned or operated by another, who has supervisory power over the method of rendition of the services ..." *Lordi v. County of Nassau,* 20 A.D.2d 658, 246 N.Y.S.2d 502, 504 (2d Dept.), *aff'd* 14 N.Y.2d 699, 250 N.Y.S.2d 54, 199 N.E.2d 155 (1964) (*per curiam* ); *see also In re Yachthaven Restaurant, Inc.,* 103 B.R. 68, 72 (Bankr. E.D.N.Y.1989) (license in real property authorizes licensee "to enter upon the land of another to do a particular act or series of acts without possessing any interest in the lands") (citing 3 Warren's Weed on New York Law of Real Property License § 102 (1989)); David P. Van Knapp, 61 *N.Y.Jur.2d* Statute of Frauds, § 123 at 196 (1987) ("[a] license with respect to real property is a privilege to do one or more acts on land, without having an interest [in the land] therein.") The license is personal to the licensee, *see Simmons v. Abbondandolo,* 184 A.D.2d 878, 585 N.Y.S.2d 535 (3d Dept.1992), and is created for a limited purpose. *See Harmatz v. Glickman,* 13 Misc.2d 271, 176 N.Y.S.2d 454, 454 (Sup.Ct. Kings Co. 1958);

*see also* 49 *N.Y.Jur.2d* Easements and Licenses in Real Property § 199 at 330 (1987) ("[a] license to do an act on land involves the occupation of the land by the licensee so far as is necessary to do the act and no further").

The case of *Lordi v. County of Nassau,* 20 A.D.2d 658, 246 N.Y.S.2d 502 (2d Dept.), *aff'd* 250 N.Y.S.2d 54, 199 N.E.2d 155 (1964), is instructive regarding the relationship between BLS and the Debtor. There, the plaintiff and defendant entered into a written agreement which granted defendant the exclusive right, for a period of ten months, to operate a golf pro shop at a park owned and maintained by the defendant. In consideration therefor, plaintiff agreed to pay defendant 6% of the gross proceeds from its operations. The agreement lapsed and plaintiff continued to operate the pro shop. After a period of more than two years, defendant notified plaintiff that it was terminating the relationship. Plaintiff sought an injunction. The trial court ruled that plaintiff was a holdover tenant and enjoined defendant from taking any action to evict him, pending, among other things, plaintiff's receipt of a thirty day notice of defendant's intention to terminate the tenancy. 246 N.Y.S.2d at 504. The Appellate Division reversed, holding that plaintiff acquired no rights as a holdover tenant and that the underlying agreement was a license which was revocable by defendant at will. 246 N.Y.S.2d at 505. Among the factors cited by the court in finding that the agreement was a license were that it (1) failed to confer exclusive possession of the premises in the plaintiff, (2) vested defendant with supervisory power over the operation of plaintiff's business and (3) authorized defendant to alter the physical layout of plaintiff's premises. *Id.* The Court of Appeals affirmed that judgment in all respects. *See* 250 N.Y.S.2d 54, 199 N.E.2d 155.

■ The debtor contends that the rights created under the Agreement give rise to something other than a license in real property, arguing that "[t]he use of the realty, while important, is incidental to what is in effect a guarantee of sales provided the Debtor complies with its agreement." *See* Debtor's Memorandum of Law In Opposition To Brooklyn Law School's Order To Show

Cause Why The Automatic Stay Should Not Be Lifted, at p. 7 (footnotes omitted).[5] We find no merit to that contention. Nothing in the Agreement guarantees Debtor any level of sales at the bookstore. Moreover, the argument ignores that a license in real property vests the licensee with precisely what Debtor claims to have: exclusive access to a market which the licensee otherwise would not enjoy. *See e.g., Lordi v. County of Nassau,* 250 N.Y.S.2d 54, 199 N.E.2d 155; *In re Yachthaven Restaurant, Inc.,* 103 B.R. 68.

■ We construe the Agreement as a license in real property. First, it is labelled a license to operate a bookstore. *See* Agreement, p. 1 (Debtor is granted "the sole right, permission, license, and privilege to operate [the bookstore]"); Agreement, p. 1 (the Agreement "shall not create any relationship of landlord and tenant between the Law School and [the debtor], but the sole relationship shall be that of a licensor and licensee.")[6] Second, it restricts Debtor's rights under the Agreement to "operat[ing] a Law School bookstore for the sale of stationery, casebooks, hornbooks, review books, and bookstore related products, *and for no other purpose." Id.,* p. 1, ¶ 1 (emphasis added). *See Lordi v. County of Nassau,* 246 N.Y.S.2d 502, *aff'd* 250 N.Y.S.2d 54, 199 N.E.2d 155 (limited right to operate a golf pro shop is a license in real property); *In re Yachthaven Restaurant, Inc.,* 103 B.R. 68 (right to operate, maintain and make improvements to marina area and to operate restaurant at marina is a license in real property). Finally, BLS is vested with expansive supervisory controls over the conduct of Debtor's business. *See, e.g.,* Agreement, p. 1, ¶ 1 ("[l]icense[e] shall at all times conduct his business in a high quality, lawful reputable manner, and in a manner which will compliment the law school"); Agreement, p. 1 ("[n]o obscene, indecent or other objectionable material shall be offered for sale. [BLS] retains the right in its sole discretion, to prohibit the sale of any material it deems objectionable"); Agreement, p. 1, ¶ 2 (restrictions on Debtor's right to advertise outside store without prior approval by BLS); Agreement, p. 2, ¶ 1 (mandatory hours of operation); Agreement, p. 2, ¶¶ 2–6 (mandatory pricing requirements). *See, e.g., Lordi v. County of Nassau,* 246 N.Y.S.2d at 505 (terms of agreement specified portion of premises licensee could occupy and licensor had supervisory control over method in which licensee rendered service); *Layton v. A.I. Namm & Sons, Inc.,* 275 A.D. 246, 89 N.Y.S.2d 72 (1st Dept.), *aff'd,* 302 N.Y. 720, 98 N.E.2d 590 (1951). (agreement limited space within store where optician could conduct his business and permitted licensor to alter that space); *Kaypar Corporation v. Fosterport Realty Corporation,* 1 Misc.2d 469, 69 N.Y.S.2d 313 (Sup.Ct. Sp.Term Bronx Co.), *aff'd,* 272 A.D. 878, 72 N.Y.S.2d 405 (1st Dept.1947) (agreement allotted limited space to licensee for installation of coin operated washing machines and did not provide for exclusive possession of that space); *Planetary Recreations, Inc. v. Kerns, Inc.,* 184 Misc. 340, 54 N.Y.S.2d 418 (N.Y.Cty.Ct.1945) (agreement limited where licensee could operate coat check service and

---

5. The Debtor cites *Golden Distributors, Ltd. v. Reiss (In re Golden Distributors, Ltd.),* 122 B.R. 15 (Bankr.S.D.N.Y.1990) for the proposition that the Agreement vests it with intangible rights which are protected by the automatic stay. In that case, the debtor sought to enforce the stay imposed by § 362(a)(3) to enjoin defendants from soliciting its customers and enforce restrictive covenants contained in certain of the defendants employment agreements. The debtor argued that the former employees were depriving the estate of its property interest in its good will and its contracts with customers in violation of the stay. While the court recognized that the stay protects the Debtor's good will and acknowledged that exclusive contractual agreements, subscriptions, and memberships between customers and debtors can be property of the estate, *see* 122 B.R. at 20, it refused to issue an injunction because the debtor had not shown that the defendants had appropriated any such property of the Debtor's estate. The court found that the Debtor was not protecting property of the estate but the debtor was instead trying to enforce the non-compete clauses in the defendant's contracts. This case simply does not support the contention that the Agreement is a guaranteed sales contract.

6. We recognize that the labels used in the Agreement do not determine the nature of the relationship created thereunder. *See Lordi v. County of Nassau,* 246 N.Y.S.2d at 504. However, when considered with the other enumerated factors, the parties' use of the terms "licensor" and "licensee" adds to our conclusion that the Agreement is merely a license in real property.

did not allow for exclusive possession by licensee).

 Any right created in Debtor's estate by the Agreement is protected by the automatic stay. *See In re Tudor Motor Lodge Assoc. Ltd. Partnership,* 102 B.R. 936, 948 (Bankr.D.N.J.1989); *In re R.S. Pinellas Motel Partnership,* 2 B.R. 113, 116 (Bankr. M.D.Fla.1979). The nature and extent of those rights, if any, are fixed by state law. *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The filing of a petition under the Code does not expand those rights. *See, e.g., Moody v. Amoco Oil Company,* 734 F.2d 1200, 1213 (7th Cir.), *cert. denied* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984) ("section 541(a) provides that a debtor's estate consists of 'all legal or equitable interests of the debtor in property as of the commencement of a case.' Thus whatever rights a debtor has in property at the commencement of the case continue in bankruptcy-no more, no less.") The common law rule is "that a license in real property is revocable at the will of the licensor unless it is coupled with an interest or made irrevocable by the terms of the contract." *In re Yachthaven Restaurant, Inc.,* 103 B.R. at 78. A license created by contract for a definite period expires at the end of that period. *See, e.g., Nemmer Furniture Co. v. Select Furniture Co.,* 25 Misc.2d 895, 208 N.Y.S.2d 51, 56 (Sup.Ct.Erie Co.1960) (a license for a definite term embodied in a contract cannot be revoked without giving rise to an action for breach of that contract); *Bermann v. Windale Properties, Inc.,* 10 Misc.2d 388, 169 N.Y.S.2d 975, 977 (Sup.Ct.West.Co.1957) (same).

 Debtor argues that by permitting it to operate the bookstore beyond the one year period stated in the Agreement (December 16, 1982 through December 15, 1983), BLS extended it through December 15, 1986, and for successive three year periods thereafter. That argument ignores that in New York, a contract which by its terms cannot be performed within the year after it was made is unenforceable unless it is in writing. *See* N.Y.Gen.Oblig.Law § 5–701(a)(1) (McKinney 1989) [7]; *see also D & N Boening, Inc. v. Kirsch Beverages, Inc.,* 63 N.Y.2d 449, 483 N.Y.S.2d 164, 472 N.E.2d 992 (1984); *Sanyo Electric, Inc. v. Pinros & Gar Corp.,* 174 A.D.2d 452, 571 N.Y.S.2d 237, 238 (1st Dept. 1991). BLS' right to continue the Agreement for three years beyond the stated one year period is merely an "agreement to agree" which is subject to the Statute of Frauds. *See, e.g., Candid Productions, Inc. v. International Skating Union,* 530 F.Supp. 1330 (S.D.N.Y.1982); *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981); *Yan's Video, Inc. v. Hong Kong TV Video Programs, Inc.,* 133 A.D.2d 575, 520 N.Y.S.2d 143 (1st Dept.1987). The parties concur that the Agreement has not been superseded, amended or extended by another writing. Indeed, there has been no communication among them regarding the terms of the Agreement since shortly after it was executed in 1982. Thus, the Agreement cannot be construed as vesting Debtor with the right to operate the bookstore beyond December 15, 1983.[8]

 A license for a fixed period which has lapsed is terminable at will by either

---

**7.** The parties concur that New York law governs the interpretation of the Agreement. The Statute of Frauds provides that:

 a. Every agreement, promise or undertaking is void unless it or some note or memorandum thereof in writing and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime ...

N.Y.Gen.Oblig.Law § 5–701(a)(1) (McKinney 1989).

**8.** Debtor insists that the case of *Hawes Office Systems, Inc. v. Wang Laboratories, Inc.,* 537

F.Supp. 939 (E.D.N.Y.1982), supports its contention that the Agreement has been renewed through December 15, 1995, by the actions of the parties. Reliance on that case is misplaced for two reasons.

First, the case does not stand for the proposition that a multi-year contract subject to the Statute of Frauds can be renewed for the full period of the agreement by continued performance under the agreement. In that case, *Hawes* entered into a contract with Wang to supply sales services. The contract was for a period of one year and was renewable for an additional one year period if done so by the parties in writing. At the expiration of the initial term of the contract, Hawes wrote to Wang requesting that it accept a new sales quota for the

party. *See Lordi v. County of Nassau,* 20 A.D.2d at 660, 246 N.Y.S.2d at 505 (citing *United Merchant's Realty & Improvement Co. v. New York Hippodrome,* 133 A.D. 582, 118 N.Y.S. 128, *aff'd,* 201 N.Y. 601, 95 N.E. 1140 (1911)). The only limitation on that right to terminate the license is that the party act in good faith. *See In re Yachthaven Restaurant, Inc.,* 103 B.R. at 73: *see also Sky–View Inc. v. State of New York,* 129 Misc.2d 106, 492 N.Y.S.2d 866, 870 (Ct.Cl. 1985) (a license is revocable at will unless the conduct of the licensor makes it inequitable to permit licensor to do so). In an effort to allay BLS' concerns about its ability to obtain the books needed for the Spring semester, Debtor agreed to permit BLS administrative personnel to conduct an on site review of the inventory at the bookstore on December 1, 1993. At that time, the list of Spring course offerings and enrollment figures was not available to Debtor. Accordingly, BLS limited its review to books needed for courses regularly offered during the Spring semester. At the evidentiary hearing, BLS demonstrated that on the basis of its review, Debtor had less than 50% of the books needed for those courses.[9]

In an effort to counter that evidence, Debtor submitted its own inventory list which it included books located at BLS, Cardozo Law School and Touro Law School. It argues that the list demonstrates that in the aggregate it has at least 80% of the books it will need at BLS for the Spring semester. We accord little weight to that evidence. First, it is based on inventory figures which are more than three months old. Second, it appears to inflate those figures. For example, although BLS requires only 76 books for its Unincorporated Business Associations class, Debtor's inventory shows that it has 227 texts in all. By including the 148 texts not needed at BLS in the inventory, Debtor covers shortfalls for books need in other classes. Thus, although Debtor may have 80% of the necessary titles, it does not necessarily have 80% of the books needed for the Spring semester. Third, it assumes that Debtor will not need the books presently in the bookstores at Cardozo and Touro Law Schools to meet student needs at those schools or the books at BLS to meet those needs. Debtor has not established that to be the case.

During the hearing Mr. Hollander admitted that the Debtor does not have the cash and cannot obtain the necessary credit to purchase the books. He testified that he would infuse the necessary funds into the business personally, and that he had personal credit lines of in excess of $50,000 readily available to him. There is no evidence, however, that those funds will be adequate to ensure that Debtor will be able to obtain the necessary texts.

following twelve months. Wang failed to respond to the letter although for a period of three months thereafter, it booked orders obtained by Hawes. Wang served Hawes with a notice of termination. Hawes sued Wang for breach of contract. Among other things Wang alleged that it was not liable for breach because the contract had not been renewed. In partially disposing of cross motions for summary judgment, the court held that by its terms the agreement was renewable by the actions of the parties and that a writing was unnecessary. 537 F.Supp. at 942. It then held that the agreement had been renewed. *Id.* at 945.

Second, even if *Hawes* could be read as support for its legal theory, debtor has not pointed to any actions taken by BLS which could form the predicate for arguing that the Agreement was renewed. Indeed, Debtor only contends that BLS remained silent in the face of Debtor's continued operation of the store.

Although not raised by the Debtor, we note that in extreme circumstances courts will apply the doctrine of promissory estoppel to preclude the assertion of a Statute of Frauds defense.

However, that doctrine "is properly reserved for that limited class of cases where 'the circumstances are such as to render it *unconscionable* to deny' the promises upon which the plaintiff has relied." *Philo Smith & Co. v. USLIFE Corp.,* 554 F.2d 34, 36 (2d Cir.1977) (emphasis original) (citation omitted). Those circumstances plainly are absent in this case.

9. We recognize that the inventory review was not conducted by persons who regularly conduct inventories. Further, based on the testimony of Mr. John Ross, Debtor's employee on site during the review, it would appear that the review was less than exact. However, we are satisfied that the review was undertaken and conducted in good faith and to the best of the ability of the individuals involved with the review. Moreover, even fully crediting the testimony of Mr. Ross, we are persuaded that Debtor has no more than 50% of the texts at the bookstore that it will need for the regularly offered courses during the Spring semester. In respect of the accuracy of the inventory, we note that Mr. Hollander was asked to attend. He declined to do so.

BLS' good faith in this matter is manifest. Termination of its relationship with Debtor will promote the law school's policy of engaging in short term service contracts and eliminate the uncertainties presently existing regarding whether Debtor will be able to obtain the text books needed in the Spring semester. Under these facts, and as a licensor at will, it cannot be required to continue its business relationship with Debtor. Accordingly, it is entitled to relief from the automatic stay to serve the Proposed Notice [10] and take appropriate steps to recover possession of the Premises. *See In re Chautauqua Capital Corp.*, 135 B.R. 779, 782 (Bankr.W.D.Pa.1992).

### Conclusion

Based on the foregoing, BLS' motion for relief from the automatic stay is granted. BLS is directed to SETTLE AN ORDER.

10. Pursuant to RPAPL § 713

[a] special proceeding may be maintained under this article after a ten-day notice to quit has been served upon the respondent in the manner prescribed in section 735, upon the following grounds:

\* \* \* \* \* \*

7. He is a licensee of the person entitled to possession of the property at the time of the license, and (a) his license has expired, or (b) his license has been revoked by the licensor, or (c) the licensor is no longer entitled to possession of the property; provided, however, that a mortgagee or vendee in possession shall not be deemed to be a licensee within the meaning of this subdivision.

*See* RPAPL § 713 (McKinney 1979).